UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.

UNITED STATES OF AMERICA,

Plaintiff,

v.

APPROXIMATELY $877,036.72 (US) FORMERLY ON DEPOSIT IN ACCOUNT NUMBER 229057932478 HELD AT BANK OF AMERICA, N.A., IN THE NAME OF PRONTO MEDICAL CENTER CORP SEIZED ON OR ABOUT FEBRUARY 23, 2026, PURSUANT TO JUDICIAL WARRANT,

Defendant *in Rem.*

**VERIFIED COMPLAINT FOR FORFEITURE *IN REM***

Plaintiff, the United States of America, by and through its undersigned counsel, alleges as follows:

## I. NATURE OF THE ACTION

1. This is a civil action *in rem* brought pursuant to 18 U.S.C. § 981(a)(1)(C) and the procedures set forth in Rule G of the Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions, the Federal Rules of Civil Procedure, to judicially forfeit the Defendant *in Rem*, more fully described as follows (collectively, the "Defendant Asset"):

(a) Approximately $877,036.72 (US) formerly on deposit in account number 229057932478 held at Bank of America, N.A., in the name of Pronto Medical Center Corp ("Subject Account"), which was seized on or about February 23, 2026, pursuant to judicial warrant, to include accrued interest.

.[1]

## II. JURISDICTION AND VENUE

2. This Court has jurisdiction over this subject matter. *See* 28 U.S.C. §§ 1345, 1355(a); 18 U.S.C. § 981(a)(1).

3. This Court has *in rem* jurisdiction over the Defendant Asset. *See* 28 U.S.C. §§ 1345, 1355(b).

4. Venue for this action is proper in this District because acts or omissions giving rise to the forfeiture occurred in the Southern District of Florida, and because this is the same District where the Defendant Asset was brought upon seizure. *See* 28 U.S.C. §§ 1355(b)(1), 1395; 18 U.S.C. § 981(h).

## III. FACTUAL ALLEGATIONS

At all times material to this civil action *in rem*:

### A. The Medicare Program

5. The Medicare Program ("Medicare") was a federal health care program that provided free or below-cost health care benefits to individuals who are 65 years of age or older or disabled. The benefits available under Medicare were governed by federal statutes and regulations.

6. The United States Department of Health and Human Services ("HHS"), through its agency the Center for Medicare and Medicaid Services ("CMS"), oversaw and administered Medicare.

7. Individuals who received benefits under Medicare were commonly referred to as "Medicare beneficiaries."

8. Medicare was a "health care benefit program," as defined by 18 U.S.C. § 24(b).

[1] All dates and amounts referenced in this Verified Complaint are approximate.

9. Medicare was subdivided into four program "parts," which were: hospital insurance (Part A), medical insurance (Part B), Medicare Advantage (Part C), and prescription drug benefits (Part D).

10. Medicare Part B covered human cell, tissue, or cellular or tissue-based products (HCT/P), frequently referred to as skin substitutes or skin substitute grafts.

11. As a biologic skin substitute graft, SimpliMax was classified as an HCT/P. It was categorized as a cellular and tissue-based product for the treatment of diabetic foot ulcers and venous leg ulcers.

12. Medicare claims for Part B services were processed and paid by Medicare Administrative Contractors ("MAC(s)"), which contracted with CMS to administer parts of Medicare in specific geographic jurisdictions.

13. Physicians, clinicians, health care facilities, and suppliers that enrolled in Medicare and delivered services to Medicare beneficiaries were referred to as Medicare "providers."

14. To enroll as a Medicare provider, physicians, clinicians, health care facilities, and suppliers were required to complete a Medicare Provider Enrollment Application (CMS-855 form).

15. Applicants were required to have a valid National Provider Identifier (NPI), which was a 10-digit, universal, lifetime identifier for healthcare providers, to enroll as a Medicare provider.

16. Applicants were required to provide identifying information, practice locations, correspondence addresses, billing agency details, and a signed certification statement.

17. Applicants were required to certify that they would comply with all Medicare laws, regulations, and policies regarding reimbursement.

18. Applicants were required to submit their Medicare enrollment application using the online Internet-based CMS Provider Enrollment, Chain, and Ownership System (PECOS) or by mailing the appropriate CMS-855 form to the MAC for their geographic region.

19. The PECOS was the online Medicare enrollment management system maintained by CMS. The platform allowed physicians, clinicians, health care facilities, and suppliers to electronically enroll as Medicare providers or suppliers. Users could also utilize PECOS to renew enrollment, withdraw from the program, report record changes, and sign documentation. While MAC(s) processed the initial applications, PECOS served as the final repository for all Medicare provider enrollment data.

20. Upon approval of a Medicare Enrollment Application, Medicare assigned an enrolled Medicare provider a Provider Transaction Access Number (PTAN), which was referred to as a Medicare "provider number."

21. A Medicare provider was authorized to submit claims to Medicare for reimbursement of medically necessary covered services rendered to Medicare beneficiaries.

22. To receive Medicare reimbursement for medically necessary covered services, Medicare providers were required to file a claim electronically or submit a CMS-1500 or UB-92 form to their MAC.

23. To be valid, a Medicare claim was required to include, among other things, the beneficiary's name and Medicare Beneficiary Identifier (MBI), the services provided, the dates and costs of the services provided, the diagnostic and procedural codes validating medical necessity, and the name and NPI of the ordering or prescribing physician.

24. Providers could use their respective MAC internet-based portals to submit Medicare claims electronically.

25. Medicare providers were legally required to submit claims only for services that were rendered and that meet Medicare's criteria for being reasonable and medically necessary.

26. Medicare providers were required to submit a CMS-588 Electronic Funds Transfer (EFT) Authorization Agreement and a voided check or letter from their financial institution with their enrollment application to receive Medicare claims reimbursement payments electronically.

27. All Medicare reimbursement payments were transmitted directly to a Medicare provider's financial institution, whether the underlying claims were submitted electronically or on paper.

### B. Pronto Medical Center Corp

28. Pronto Medical Center Corp ("Pronto") was a Florida corporation with its principal office address listed as 900 West 49 Street, Unit 408 Hialeah, Florida 33012, which is within the Southern District of Florida.

29. According to Florida Department of State Division of Corporations records, Pronto was incorporated on or about September 21, 2018 (Document number P18000079936; FEI/EIN Number: 83-1975597.

30. Pronto's corporate filings detailed a series of presidential changes as follows:

(a) September 21, 2018 (Articles of Incorporation): Lists Individual One as President.

(b) March 1, 2025 (2025 Annual Report): Lists Individual Two as President, removing Individual One.

(c) March 20, 2025 (2025 Amended Annual Report): Lists Individual Three as President, removing Individual Two.

(d) March 25, 2025 (Articles of Amendment): Reaffirms Individual Three as President.

(e) September 9, 2025 (Articles of Amendment): Lists Individual Four as President, removing Individual Three.

31. Pronto's Medicare enrollment became effective on April 3, 2024. Individual One was listed as Pronto's owner, director, managing employee, and authorizing official.

32. As part of its Medicare provider enrollment application, Pronto submitted a voided check and an EFT Authorization Agreement for the Subject Account. The EFT agreement bore a signature purporting to be that of Individual One as Pronto's authorized official.

33. PECOS records indicate Pronto submitted a Change of Information (COI) application on March 20, 2025, with the following details:

(a) Individual Three was designated as Pronto's sole owner, authorizing official, director, and managing employee.

(b) The COI was approved on April 10, 2025, with a retroactive effective date of March 20, 2025.

(c) The EFT Authorization Agreement directing payments to the Subject Account remained unchanged.

### C. Subject Account

34. On September 27, 2018, Individual One opened the Subject Account at Bank of America in Miami, Florida, under Pronto's name. The Subject Account's opening documents listed Individual One as Pronto's President and sole authorized signer.

35. On March 1, 2025, Individual Three replaced Individual One on the Subject Account's documents, assuming the roles of Pronto's President and its sole authorized signer.

### D. Medicare Fraud Scheme

36. Between May and June 2025 ("Subject Period"), co-conspirators caused Pronto to submit $13,605,400 (US) in false and fraudulent Medicare claims for SimpliMax and skin substitute grafts allegedly provided to sixteen (16) beneficiaries. These treatments were neither medically necessary nor ever provided.

37. Every claim used the exact same three diagnosis codes, which purported to reflect a residence visit and the application of SimpliMax skin grafts to wounds on the trunk, arms, or legs.

38. The purported beneficiaries had no medical need for wound care dressings and never requested or received these SimpliMax grafts.

39. All claims submitted by Pronto during this period identified Doctor 1 as the referring provider.

40. Throughout the Subject Period, Doctor 1, a pediatrician, had no knowledge of Pronto. Doctor 1 never treated any of the claimed beneficiaries, never prescribed wound care dressings or SimpliMax grafts, and never authorized Pronto to use his/her NPI for Medicare billing.

**E. Defendant Asset**

41. On June 5, 2025, the Subject Account had an end-of-day closing balance of $84.47 (US).

42. Between June 6 and June 27, 2025, the Subject Account received $2,491,632.24 (US) in eight Medicare reimbursement payments for claims Pronto submitted during the Subject Period. This comprised all deposits into the Subject Account during June 2025.

43. At the end of June 2025, Bank of America, N.A. closed the Subject Account and transferred its remaining balance of $877,036.72 (US) into a "hold harmless" account.

44. A tracing analysis conducted under generally accepted accounting principles (GAAP) demonstrated that the Subject Account's entire closing balance of $877,036.72 (US) derived exclusively from fraudulently procured Medicare reimbursements.

45. On February 23, 2026, federal law enforcement agents served a judicial warrant on Bank of America, N.A. for all funds, principal, interest, and dividends credited to or formerly on deposit in the Subject Account.

46. Pursuant to the warrant, Bank of America, N.A., remitted $877,036.72 (US) to federal law enforcement.

**47.** Accordingly, Homeland Security Investigations (HSI) seized the $877,036.72 (US), which constitutes the Defendant Asset.

## IV. BASIS FOR FORFEITURE

48. Pursuant to 18 U.S.C. § 981(a)(1)(C), any property, real or personal, which constitutes or is derived from proceeds traceable to a specified unlawful activity or a conspiracy to commit such offense is subject to civil forfeiture.

49. Pursuant to 18 U.S.C. § 1956(c)(7)(F), any act or activity constituting an offense involving a "Federal health care offense" constitutes a specified unlawful activity.

50. Pursuant to 18 U.S.C. § 24(a)(1), a violation of, or a conspiracy to violate, 18 U.S.C. § 1347 (Health Care Fraud) is a "Federal health care offense."

51. Pursuant to 18 U.S.C. § 1347 it is a crime for anyone, in connection with the delivery of any health care benefits, items, or services, to knowingly and willingly execute, or attempt to execute, a scheme or artifice: (1) to defraud any health care benefit program; or (2) to obtain, by means of materially false or fraudulent pretenses, representations, or promises, any of the money or property owned by, or under the custody or control of, any health care benefit program.

## FIRST CLAIM
**Proceeds of Conspiracy to Commit Health Care Fraud**
**18 U.S.C. § 981(a)(1)(C)**

52. The factual allegations in paragraphs 1 through 51 are re-alleged and incorporated by reference as if fully set forth herein.

53. As set forth above, the Defendant Asset is property that constitutes or is derived from proceeds traceable to a conspiracy to commit health care fraud in violation of 18 U.S.C. § 1349, which is a specified unlawful activity pursuant to 18 U.S.C. § 1956(c)(7)(F).

54. Accordingly, the Defendant Asset is subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(C).

**SECOND CLAIM**
**Proceeds of Health Care Fraud**
**18 U.S.C. § 981(a)(1)(C)**

55. The factual allegations in paragraphs 1 through 51 are re-alleged and incorporated by reference as if fully set forth herein.

56. As set forth above, the Defendant Asset is property that constitutes or is derived from proceeds traceable to health care fraud in violation of 18 U.S.C. § 1347, which is a specified unlawful activity pursuant to 18 U.S.C. § 1956(c)(7)(F).

57. Accordingly, the Defendant Asset is subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(C).

**WHEREFORE**, the United States of America prays that notice issue on the Defendant Asset; that due notice be given to all parties to appear and show cause why the forfeiture should not be decreed; that a warrant of arrest *in rem* issue according to law; that judgment be entered declaring that the Defendant Asset be forfeited for disposition according to law; and that the United States of America be granted such other relief as this Court may deem just and proper, together with the costs and disbursements of this action.

Respectfully submitted,

JASON A. REDING QUIÑONES
UNITED STATES ATTORNEY

By: ______________________

Daren Grove (Court No. A5501243)
Assistant United States Attorney
E-mail: daren.grove@usdoj.gov
500 E. Broward Boulevard, Office 822
Fort Lauderdale, Florida 33394
Telephone: 954.660.5774
Facsimile: 954.356.7180

**VERIFICATION**

I, Manuel Hernandez, hereby verify and declare, under penalty of perjury, that I am a Special Agent with the Homeland Security Investigations (HSI) and that the foregoing factual allegations are true and correct to the best of my knowledge and belief.

The sources of my knowledge and information and the grounds of my belief are the official files and records of the United States, information supplied to me by other law enforcement agents, as well as my investigation of this case, together with others, as a Special Agent of the FBI.

Executed on this 22nd day of June 2026.

Manuel Hernandez, Special Agent
Homeland Security Investigations